IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| v. | * | Case No.: GJH-17-371 |
| **JAMES THOMAS WOODLAND,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

An interrogation of an individual suspected of serious criminal activity will often consist of something other than a polite exchange of questions and answers. Law enforcement is also not obligated to identify and use the location that would be most appealing to the subject of the interrogation or to provide the subject with every accommodation that the subject might desire. But when the environment in which the interrogation is conducted becomes one in which a reasonable person would not believe that he could terminate the interrogation and leave, the subject must be advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Here, law enforcement interrogated the Defendant for over two hours, in an area of the Westlake Post Office they controlled, confronted him with evidence of his guilt, interrupted him frequently using an increasingly hostile tone when he denied the allegations, repeatedly threatened him with a lengthy prison sentence, and accompanied and continued recording him during his "break." Although the Court finds that the consent that Defendant gave to search his phone was voluntary, because the Court finds that the Defendant was in custody for purposes of *Miranda* and he was not advised of his *Miranda* rights, the statements made by the Defendant during the interrogation will be suppressed.

In this case, the Government has charged Defendant James Thomas Woodland, a United States Postal Service ("USPS") mail carrier, with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. ECF No. 1 at 1.[1] Presently pending before the Court are Defendant's Motions to Suppress All Alleged Government Interrogation Statements, ECF No. 23, and All Alleged Evidence Obtained Through Consent Searches, ECF No. 24 (supplemented by ECF No. 25). The motions have been fully briefed, and an evidentiary hearing was held on December 11, 2017. ECF No. 30. For reasons explained in more detail below, Defendant's Motion to Suppress All Alleged Government Interrogation Statements, ECF No. 23, is granted and Defendant's Motion to Suppress All Alleged Evidence Obtained Through Consent Searches, ECF No. 24, is denied.

## I. BACKGROUND

On July 12, 2017, the Government filed the Indictment in this case, charging Defendant with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. ECF No. 1 at 1. On November 8, 2017, Defendant filed motions to suppress any statements he made during his April 25, 2017, interview with law enforcement, arguing that the interview amounted to a custodial interrogation requiring that he be read his *Miranda* rights, ECF No. 23, and evidence obtained from searches of his phone, car, and residence, arguing that he did not give valid consent to these warrantless searches, ECF No. 24. The Government opposed these motions, ECF No. 27, and an evidentiary hearing was held on December 11, 2017. ECF No. 30. At that hearing, the Government presented two witnesses: Hugo Aldana, the USPS Postmaster of Bethesda, Maryland, and Special Agent Ivan Balaguer, a USPS Postal Inspector who was in charge of the investigation and interview of Defendant. Postmaster Aldana testified

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

regarding the circumstances leading up to Defendant's interview with law enforcement, and Balaguer testified as to the content of the interview. The Government also provided the Court with an audio recording of the interview of Defendant, which the Court reviewed multiple times in chambers.[2] Unless otherwise stated, the Court found the witnesses to be credible, *but see infra* n.10, and finds the facts to be consistent with the testimony summarized below and in the discussion that follows.

Postmaster Aldana testified that he began his career with USPS in 1988 and has held the position of Postmaster for two and a half years. As Postmaster, Aldana is responsible for all postal-related activities in Bethesda, Maryland including the collection and delivery of the mail. Defendant was one of his employees. On April 25, 2017, Aldana received a phone call from the Office of Inspector General[3] ("OIG") regarding certain unusual packages. The OIG inspector asked questions about the letter carrier responsible for the deliveries and the addresses for the packages. Aldana identified Defendant as the responsible letter carrier. Multiple postal inspectors subsequently came to the Westlake Post Office as well as officers from the Montgomery County Police Department; upon arrival, they indicated that they wanted to speak to the Defendant about questionable packages, possibly involving narcotics. At Aldana's direction, a supervisor called the Defendant, who was then on his route delivering mail, and instructed him to return to the post office. Aldana testified that asking a letter carrier to return to the post office was not unusual because there was often additional mail that needed to be picked up by the carrier for delivery.

Aldana was present when the Defendant returned to the post office. Two Postal Inspectors, Balaguer and Special Agent Steven Scully, were there and said they would like to ask the Defendant some questions if he did not mind. They read him his *Garrity* rights from a pre-

---

[2] Defense counsel provided the Court with a transcript of the interview, which the Court will refer to in this Opinion for ease of reference.
[3] Aldana agreed on cross-examination that the Office of Inspector General is considered law enforcement.

3

printed document while they were all sitting in the manager's office.⁴ Defendant initialed and signed the document, indicating that he understood his rights and agreed to speak to the inspectors. Aldana described the inspectors' demeanor during this time as casual. Defendant was not told that he had to speak to law enforcement or that he had to accompany them to another room but he agreed to do so. The Defendant, Scully and Balaguer all then left the manager's office and went upstairs to the OIG office. Aldana stayed behind but later spoke to the Defendant about being suspended after the conversation upstairs was completed. Aldana believes it was a "couple of hours or an hour or two" between the time Balaguer and Scully took the Defendant upstairs and when they brought Defendant back downstairs.⁵

Balaguer testified that he is a Postal Inspector and has been in that position for five years. He works at the Westlake Post Office in Bethesda. On April 25, 2017, he had been doing surveillance on the Defendant as the Defendant delivered mail on his route. Between 12:45 and 1:00 PM, he was informed that a call had been made to have Defendant return to the post office. He followed Defendant back to the Westlake Post Office and saw him enter the facility. Balaguer entered through a different entrance, and contacted Scully who met them there. Balaguer next saw the Defendant when Aldana brought him into a manager's officer where Scully and Balaguer were waiting. The door was closed behind them and there were four of them in the room. Scully identified himself and introduced Balaguer; both individuals were in plain clothes but introduced themselves as "police." Scully read him his *Garrity* rights, which included advising the Defendant that he was free to leave. The Defendant reviewed the form and initialed

---

⁴ Reading *Garrity* rights to a government employee includes notifying the employee that (1) he has the right to remain silent, (2) anything he says or does could be used against him in court or in administrative proceedings, (3) he will not be disciplined solely for remaining silent and (4) the interview is voluntary and he can cease answering questions at any time. ECF No. 27-1 at 2. The genesis of these rights is found in the Supreme Court's holding in *Garrity v. New Jersey*, 385 U.S. 493 (1967), which "prohibited the use in criminal proceedings of governmental employees' self-incriminating statements obtained under threat of termination." *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 583 (4th Cir. 2007).

⁵ The Government acknowledges that the interview was two and a half hours including breaks. ECF No. 27 at 3.

4

and signed it. Balaguer asked the Defendant if he would accompany them to a room on the second floor so they could have a more private conversation. The Defendant agreed to go to the second floor, and was not restrained as they went upstairs. They went upstairs and into an area that is access-controlled and that only OIG has access to. A badge is needed to get in but not to exit.

A total of five law enforcement personnel were in the OIG office with the Defendant: Scully, Balaguer, another Postal Inspector and two Montgomery County Police Department detectives. Everyone was in plain clothes and their weapons were concealed within their jackets. No officer sat between the Defendant and the door at any time. Recording began almost as soon as the Defendant entered the room. The door remained open for most of the interview, although it was closed about 60-90 minutes into the interview because of 3-5 agents who arrived outside of the interview room. Those agents were also involved in the instant case. The door was closed at that point to minimize distraction. Defendant had a cellphone in his possession during the interview and, at some point, Balaguer asked for consent to search the cellphone. According to Balaguer's testimony on direct examination, the Defendant gave verbal consent, unlocked the phone and handed it to Balaguer.[6]

Thirty minutes into the interview, the Defendant asked for a cigarette break and, eventually, he was provided one. The Defendant was accompanied by Balaguer and a detective during the smoke break. Balaguer testified that he accompanied the Defendant on the smoke break "to be friendly." He continued recording the conversation during the smoke break. When going out for the smoke break, they went downstairs into a rear gated area, stepped out and walked to the Defendant's postal vehicle; from there, the Defendant retrieved his cigarettes.

---

[6] The audio recording does not contain any indication of verbal consent from the Defendant but the recorded interactions are not inconsistent with testimony that the Defendant handed the phone over in response to a request. On cross-examination, Balaguer explained that he considered that to be consent.

5

They began talking about his personal vehicle, which was 20 yards away. Balaguer asked for consent to search the vehicle and it was provided. A search of the vehicle revealed a small amount of marijuana. They walked back upstairs and continued the interview.

The officers found incriminating messages on the Defendant's phone, and Balaguer advised the Defendant that the phone was evidence and asked for consent to image the phone. The Defendant agreed and Balaguer had him sign a consent-to-search form after explaining the contents of the form. The Defendant was told that the inspectors would get a search warrant if consent was not provided.

At the end of the interview, Balaguer asked for consent to search Defendant's home after reading a consent to search form. Balaguer transported him to his residence where a consent-search of his residence took place. The reason Balaguer drove the Defendant home was concern over comments that Defendant had made regarding suicide. Defendant was not placed under arrest after the search of his home and, in fact, he was not arrested until months later.

## II.  DISCUSSION

### A. Statements Made During Non-*Mirandized* Interview

Defendant asks the Court to suppress any statements that he made during his interview with law enforcement on April 25, 2017. ECF No. 23 at 1. While the Defendant was advised of his *Garrity* rights, the parties agree that he was not advised of his *Miranda* rights before being interviewed by law enforcement. Defendant argues that he was in custody at the time and should have been advised of his *Miranda* rights. *Id.* at 4. The Government, however, argues that Defendant was never in custody, was always free to end the interview and leave the Westlake Post Office, and that the *Miranda* warnings were therefore not necessary. ECF No. 27 at 8.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. 384 U.S. at 444. Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning. *Id.* The Government does not dispute that the Defendant was interrogated; thus, the Court must determine only if the Defendant was in custody. In determining whether an individual is in custody for purposes of *Miranda*, courts determine whether, viewed objectively, "a reasonable man in the suspect's position would have understood his situation" to be one of custody. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In making this determination, courts consider factors such as "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Hashime*, 734 F.3d 278, 282, 283(4th Cir. 2013) (quoting *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010)).

Here, the "time, place and purpose of the encounter" weigh in favor of a finding of custody. Defendant was interviewed for approximately two and a half hours, with only one meaningful break where he was accompanied as he smoked a cigarette and the officers gained consent to search his car.[7] The encounter was initiated when he was ordered back to the post office by his superiors because of unusual packages. The officers made clear to the Defendant

---

[7] There appears to have been another short break towards the end of the interview.

7

very early in the encounter that they were investigating the criminal trafficking of cocaine, and that they suspected that he was involved. *See* Transcript at 6 ("we've seen these boxes come to your route before, in the past, and we've noticed something hinky about the scans . . . I just want you to be straight-up with me because there's some bad stuff in this - - in these boxes."). The majority of the interview occurred in an office, with at least five law enforcement officers present in the room. While the interrogation occurred at the Westlake Post Office, a building that Defendant was familiar with, Aldana explained that after Defendant was advised of his *Garrity* rights in the manager's office, the officers moved Defendant to an area of the building that was restricted to employees who worked at the Office of the Inspector General (OIG), an arm of law enforcement, by way of an access-restricted door. ECF No. 27 at 3. Balaguer testified that law enforcement officers needed to use a security badge to gain entrance. The interrogation occurred in an office whose door was initially left open; however, during the interrogation, the door was closed. Transcript at 44. Furthermore, Balaguer testified that a number of officers and other detectives were waiting outside the room; thus, while he could have walked out of the room he was in, in order for the Defendant to leave, he would have had to walk past law enforcement through a door that he saw was access-controlled.[8] *See United States v. Giddins*, 858 F.3d 870 880 (4th Cir. 2017) (In finding custody existed, noting that "[i]t is true that one door was unlocked in the interrogation room, but it was the door past the questioning detective. The door immediately behind [the defendant] was locked, so in order to leave the room, [the defendant] would have had to walk past [a law enforcement officer].") Putting this all together, Defendant was questioned for an extended period of time about criminal activity, in a section of his workplace controlled by law enforcement. Overall, the "time, place and purpose of the

---

[8] It is not clear if Defendant knew that a key-card or badge would not be needed to exit.

8

encounter" weigh in favor of finding that a reasonable person would not have felt free to leave, and was therefore in custody.

The "words used by the officer, the officer's tone of voice and general demeanor" strongly support a finding that Defendant was in custody at the time he was questioned. Although Aldana and Balaguer testified that the officers' initial demeanor was casual, the audio recording reveals that the law enforcement officers continuously and aggressively talked over Defendant and questioned him in a manner that was, at many points, hostile for over two hours. For instance, relatively early in the interview, the Defendant is confronted by Balaguer in this exchange:

| | |
|---|---|
| Balaguer: | And they're all coming to your route, and they're all on your scanner. And when this one says it's supposed to be delivered to this street, guess what? The geolocation on your scanner isn't in front of this address; it's at a completely different place, which is the really suspicious, really guilty part of this whole thing. Why would - - you know, if you were legitimately doing what you were supposed to do, why didn't this package go to this business, and the geolocation scan show that it was at this business? |
| Woodland: | It probably was forgotten and went to the apartments and I scanned it there and then took it over. |
| Balaguer: | For all clusters of all the past parcels? |
| Woodland: | No. Naw - - |
| Balaguer: | You know, that's the suspicious part. |
| Woodland: | Naw. |
| Balaguer: | So, again, I'm going to give you an opportunity here to just tell me straight up what's going on. You know, straight up. |
| Woodland: | And I can't tell you. All I do is drop and roll. |
| Balaguer: | That's not what you're doing. |
| Woodland: | Yeah, I'm might be – |

9

| | |
|---|---|
| Balaguer: | That's not what you're doing. |
| Woodland: | I'm – sometimes I'll be at 6600-150, and I'm getting ready to go to Rock Forest or I'm getting ready to go to 6500, and I scan – scan someone and get to where I have to (inaudible) about the truck, I just roll. |
| Balaguer: | That's not what you're doing, man. |
| Scully: | Let me ask – |
| Balaguer: | James, that's not what you're doing. I mean, I can prove to you – |
| Woodland: | Okay. I understand. |
| Balaguer: | -- that the scanners are – you know, if this – they're not being delivered to these addresses. They're not. That's why we – you – you know, the – it's got fancy equipment. You're holding onto it. I can tell you everywhere you've been, at what time you've been there. And I can tell you when you've scanned this one "delivered," it hasn't been at that location. It's at the – at the opposite route – at the opposite end of your route. |

Transcript at 16 -19.

In this exchange, the inspectors confronted Defendant with evidence that he was guilty, walking him through geolocation scans that purportedly demonstrated his illegal activity, and rejected his attempts to deny the allegations, both of which could further an objective belief that he was not free to leave. *See Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (finding custody existed where "[f]or the last two hours, [the defendant] had been subjected to increasingly hostile questioning at the police station, during which the detectives had accused him of showing insufficient grief, had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations.").

And throughout the interrogation, the inspectors repeatedly indicate their certainty that the Defendant is guilty of criminal activity and reference the extent of their investigation. *See* Transcript at 22 ("we've got detectives and agents at each one of these addresses –"); Transcript at 23 ("I am very convinced that you do play a part in this, okay?"); *Id.* ("Because we've got

10

video"); Transcript at 24 ("do you think it's probable that a drug-trafficking organization has found – miraculously found five businesses with dirty employees willing to receive drug parcels, and that all five of these employees and addresses just happen to be on the same postal route?"). These expressions of the inspector's belief in the guilt of the Defendant provide even further support for a finding of custody. *See United States v. James*, 113 F.3d 721, 728 (7th Cir. 1997) ("An officer's beliefs concerning the potential culpability of the individual being questioned may be one among many factors that bear upon the assessment [of] whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." (internal quotations omitted)); *United States v. Jayyousi*, 657 F.3d 1085, 1110 (11th Cir. 2011) (reasoning that objective person would not have felt free to leave after being accused of illegal activities).

Furthermore, as captured in the recording and conceded by Balaguer, the officers repeatedly pressured Defendant by informing him that he was facing significant jail time and would be fired from his job if he did not cooperate. *See* Transcript at 30 ("You've gotta get out in front of this . . . You don't want to lose your job."); Transcript at 31 ("We don't want to put you in federal prison. We - - we also have a job to do"); Transcript at 32–32 ("There's a kilo of cocaine in each one of these . . . that's like a whole lot of time in federal prison"); Transcript at 42 ("Either talk or you're going to be on the hook for . . . five kilos"); Transcript at 46 ("once we leave, it could turn real bad for you because . . . your employment is on the line."); Transcript at 104 ("you're looking at a mandatory 10 years"). To hammer home the point, the inspectors informed the Defendant that he is "not the first carrier that may go to prison for this stuff" and then proceeded to share the story of a District of Columbia Postmaster who is "still sitting in

11

prison right now for marijuana. This is coke." Transcript at 35-36. Thus, having been told that the inspectors are certain of his guilt, he is repeatedly told that he faces a lengthy federal prison sentence for his conduct. Overall, based on the tone and content of the officers' questions and statements, a reasonable person would have felt significant pressure to stay and answer the officers' questions, and would not have felt free to leave the interrogation.

Finally, "the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant" also slightly weigh in favor of a finding of custody. Although no weapons were displayed and there was no physical contact with the defendant, the questioning occurred in a room with at least five members of law enforcement, including two detectives from the Montgomery County Police Department. Defendant was aware that he was in an area of the building that was access-controlled, and at one point in the interview the door to the room he was in was closed.

The Government points to evidence that the Defendant was provided with a break to smoke a cigarette as indicative of the fact that the Defendant had the freedom to leave; but this break, the only one given between the initiation of questioning and his incriminating statements, actually proves the opposite. The first time the Defendant asks for a break to smoke a cigarette is at the 21:12 mark of the recording. Transcript at 39 ("I need a cigarette. Man, ya'll have me fucking blown right now."). In response, the interviewers simply continue to question him. At the 23:19-23:23 mark, the Defendant twice asks "Can I smoke a cigarette?" and the response is that he cannot smoke there and he is asked to "give us a minute." Transcript at 44.[9] After more attempts to compel his cooperation and more threats of repercussions, Transcript at 46 ("this is

---

[9] It is worth noting that it appears to be at this point that the door is closed as the sound of the door closing is audible on the recording and Scully then says "Well, we - - we don't need everyone seeing - - you know, seeing your business." The Court credits Balaguer's testimony that this was done for Defendant's privacy but the timing further demonstrates they are in control of the environment and the Defendant.

12

your opportunity to get ahead of it. Because once we leave, it could turn real bad for you because, you know, your employment is on the line."), the Defendant asked for "some thinking time because this shit is too much on me" and claims that "I almost killed myself last week." Transcript at 47. It is not until the 28:15 mark that Balaguer finally says "Let's get you a cigarette. Let's get you – you to think correctly." Transcript at 52. But even this eventual break occurs only after Balaguer expresses interest in the Defendant's car. *Id.* ("You got anything in your car? What kind of car you driving? . . . Is it parked here today?").

And rather than being granted "some thinking time" during the "break," the Defendant was accompanied by two officers who continued to record their conversation with him and subsequently searched his car.[10] Balaguer testified that the officers found and confiscated marijuana in Defendant's car. Thus, the Defendant's break only occurred after repeated requests from the Defendant, when it suited the inspectors' objectives, and took place in their presence while they continued to record and furthered the investigation by obtaining consent and searching his vehicle. This break, therefore, only further establishes that a reasonable person would not have believed that they were free to terminate the interview and leave. *See United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (in finding that a defendant was in custody, reasoning that "[d]uring the three hour interview, [the defendant] was guarded by [a law enforcement officer] when he smoked cigarettes") (citing *United States v. Griffin*, 922 F. 2d 1343, 1350–51 (8th Cir. 1990) ("We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest.")).

---

[10] Balaguer testified that he accompanied Defendant outside only to be "friendly" and keep him company. The Court finds this, at best, to be disingenuous. A reasonable individual in Defendant's position would not have perceived Balaguer's insistence on accompanying him outside to be a friendly gesture; rather, he would interpret it as a sign that the interview was continuing and he was not free to leave. In fact, Balaguer continued to record Defendant when they went outside, and used the opportunity to obtain consent to search his personal vehicle.

13

In their brief and at the motions hearing, the Government argued that *United States v. Maldonado*, 562 F. App'x 859, 861–62 (11th Cir. 2014), should guide the Court's decision. *See* ECF No. 27 at 10. *Maldonado*, an out-of-circuit, unreported opinion, is not persuasive. In *Maldonado*, the Eleventh Circuit affirmed the district court's denial of the defendant's motion to suppress certain statements. 562 Fed. App'x at 860. Some of the facts in *Maldonado* are quite similar to this case: the defendant, a postal worker, was stopped during her mail route, returned to her office, and questioned about misconduct in a closed room. *Id.* The Eleventh Circuit agreed with the district court that while "there were some factors to suggest the interview was custodial in nature," based on "the totality of the circumstances . . . [defendant's] interrogation was non-custodial." *Id.* at 861. However, there are stark differences between *Maldonado* and this case. In *Maldonado*, the defendant "was told several times that it was a voluntary interview and that she could leave at any time," *United States v. Maldonado*, No. 12-60316, 2013 WL 12080744, *1 (S.D. Fl. March 4, 2013); here, Defendant was told initially that he was free to leave, but hours of aggressive questioning then occurred in a different location without him being reminded of the voluntary nature of the interview. There, "[t]he questioning lasted about twenty minutes," *id.*; here, the questioning lasted over two hours. There, "[n]o threats were made to her," and the agent "did not raise his voice," *id.*; here, Defendant was repeatedly threatened with losing his job and being sent to federal prison, by numerous officers who talked over him and at times raised their voices. As such, *Maldonado* is distinguishable from this case.

And to the extent that the Government relies heavily on the fact that Defendant was told he was free to leave, "such a statement 'is not 'talismanic' or sufficient in and of itself to show a lack of custody.'" *Hashime*, 734 F.3d at 284 (quoting *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010). Defendant was told *once* that he was free to leave, while on a different floor

14

from where the interview was held, but was then subjected to aggressive questioning for over two hours, with five officers present, in a law-enforcement controlled area, was confronted with evidence of his guilt, accompanied by law enforcement on a "break" wherein they continued to record him and seek consent for a search of his vehicle, and repeatedly threatened with jail time. Looking to the totality of the circumstances, Defendant was in custody and should have been read his *Miranda* rights; as such, Defendant's motion, ECF No. 23, is granted.

### B. Evidence Obtained From "Consent" Searches

Defendant also asks the Court to suppress evidence that the Government obtained following consented-to searches of his phone, car, and home. ECF No. 25 at 4. Defendant argues that (1) "there is no record in the Interview recording" that Defendant gave consent to search his phone or vehicle, ECF No. 29 at 5; (2) that Defendant was not read his *Miranda* warnings before offering his consent, ECF No. 25 at 5; and, (3) that Defendant did not give consent voluntarily, *Id.* at 6.

First, the lack of a record regarding Defendant's spoken consent to search his phone or car does not require the Court to suppress evidence gained from subsequent searches. A defendant need not give consent verbally for there to be valid consent. Where a suspect responds to law enforcement's requests to search his person or belongings with an act that affirmatively facilitates the search, the suspect has validly consented to the search. *See United States v. Smith*, 30 F. 3d 568 (4th Cir. 1994) (in response to request to search his car, defendant approached the car and unlocked it); *United States v. Wilson*, 895 F. 2d 168 (4th Cir. 1990) (in response to an agent's request to search him, defendant shrugged his shoulders and extended his arms); *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir.1999) (finding that, by voluntarily handing over his keys, defendant consented to the search of a locked container located inside of a larger bag

that defendant was allowing police to search). At the motions hearing, Balaguer testified that, in response to the officers' request to search his phone, Defendant entered his passcode to unlock the phone and handed it to the officers. Similarly, in response to the officers' request to search his car, Defendant handed over the keys to his car. While the audio recording may not have captured Defendant's verbal consent to search his phone and car, his non-verbal conduct provided sufficient consent for the officers to go forward with their searches.

Second, the fact that Defendant was not given his *Miranda* warnings does not mean that his consent was involuntary, or that the fruits of such a search should be suppressed. In *United States v. Patane*, 542 U.S. 630 (2004), the Supreme Court considered "whether a failure to give a suspect the warnings prescribed by *Miranda* . . . requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." *Id.* at 634. The Court found that a *Miranda* violation did not require the suppression of such evidence, and concluded that "the *Miranda* rule protects against violations of the Self-Incrimination Clause, which . . . is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id. See also United States v. Nichols*, 438 F. 3d 437, 442 (4th Cir. 2006) ("the Fifth Amendment does not bar the admission at trial of the testimony of witnesses discovered through a defendant's unwarned but otherwise voluntary statements, nor does it bar the introduction of physical evidence discovered as a result of such statements." (internal citations omitted)). As such, as long as Defendant's statements of consent were voluntary, the fact that he was not given *Miranda* warnings will not preclude the admission of evidence obtained from such searches.

Defendant argues that based on the "totality of circumstances," Defendant's consent was not given voluntarily. ECF No. 25 at 6. Specifically, he argues that the officers coerced him into giving consent, rendering his consent involuntary, by threatening him with "federal prosecution

16

and a mandatory minimum sentence." ECF No. 29 at 7. The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the speaker was "overborne and his capacity for self-determination critically impaired." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). "The voluntariness of consent to search is a factual question." *Id.* While Defendant was in custody for *Miranda* purposes when he gave his consent, his will was not "overborne" nor his "capacity for self-determination critically impaired." Defendant is forty-eight years old, has been employed by the Postal Service for two decades, and has had prior experience with law enforcement. ECF No. 27 at 16–17; *compare Lattimore*, 87 F.3d at 651 (in finding statements voluntary, reasoning that "[defendant] was 29 years old, had a high school education, and held employment with the United States Postal Service. There is no indication in this record that [defendant] was a newcomer to the law." (internal quotations omitted)). While Defendant may not have felt free to leave the interview, the officers used a relaxed tone when they asked for his consent to search his phone and car, and did not make any threats regarding his failure to give consent; on multiple occasions, they simply mentioned that they could get a search warrant if he did not consent. *See United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011) (in finding that consent to search was given voluntarily under threat that officers would obtain a warrant, reasoning that "when the officer's expressed intention to obtain a warrant is genuine, and not merely a pretext to induce

17

submission, it does not vitiate consent to search." (internal quotations omitted)); *see also United States v. Braxton*, 112 F.3d 777, 782 (4th Cir. 1997) (reasoning that "[t]ruthful statements about [the defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary" (modification in original)). Considering the totality of the circumstances, Defendant voluntarily gave his consent for law enforcement officers to search his phone and car. As such, the results of those searches will not be suppressed.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress All Alleged Government Interrogation Statements, ECF No. 23, is granted, and Defendant's Motion to Suppress All Alleged Evidence Obtained Through Consent Searches, ECF No. 24 (supplemented by ECF No. 25) is denied. A separate Order shall issue.

Date: January 2, 2018

GEORGE J. HAZEL
United States District Judge